```
 1                    UNITED STATES DISTRICT COURT

 2                              FOR THE

 3                    DISTRICT OF SOUTH CAROLINA

 4                       GREENVILLE DIVISION

 5    * * * * * * * * * * * * * * *
      UNITED STATES OF AMERICA,   * CRIMINAL NO. 7:22-cr-0842
 6                                 * DECEMBER 12, 2023   9:42 A.M.
                      Plaintiff,   * SENTENCING HEARING
 7                                 *
      vs.                          *
 8                                 *
      RAQUENTIN GRAY-MILLER,       * Before:
 9                                 * HONORABLE HENRY M. HERLONG, JR.
                                   * UNITED STATES DISTRICT JUDGE
10                   Defendant.    * DISTRICT OF SOUTH CAROLINA
      * * * * * * * * * * * * * * *
11    APPEARANCES:

12

13    For the Plaintiff:        CHRISTOPHER SCHOEN, AUSA
                                 United States Attorney's Office
14                               55 Beattie Place, Suite 700
                                 Greenville, SC  29601

15

16    For Defendant Raquentin Gray-Miller:

17                               KENNETH GIBSON, ESQUIRE
                                 The Law Office of Ken Gibson
18                               141 Traction Street
                                 Greenville, SC  29611

19

20    Court Reporter:           Michele E. Becker, RMR, CRR, RPR
                                 250 E North Street
21                               Greenville, SC  29601
                                 (864) 905-8888
22

23       * * * STENOTYPE/COMPUTER-AIDED TRANSCRIPTION * * *

24

25
```

1

I N D E X

2

3   WITNESS:  TYREE SMITH

4   Direct Examination by the Plaintiff (Mr. Schoen)    Page 18

5   Cross Examination by the Defense (Mr. Gibson)       Page 33

6

7   WITNESS:  RAQUENTIN GRAY-MILLER

8   Direct Examination by the Defense (Mr. Gibson)     Page 38

9

10

11

12  EXHIBITS:

13  Plaintiff's Exhibit No. 1 admitted ................  Page 29

14

15

16

17

18

19

20

21

22

23

24

25

1          P R O C E E D I N G S

2     (Court convened at 9:42 a.m.)

3     (Proceedings in other cases were held but not transcribed

4     at this time.)

5               MR. SCHOEN:  Yes, Your Honor.  May it please the

6     Court.  The next case is 7:22-CR-00842-003, United States of

7     America versus Raquentin Gray-Miller here for sentencing.

8               THE COURT:  All right.

9               THE CLERK:  Please stand and raise your right hand.

10              (Whereupon, the defendant is duly sworn on oath.)

11              THE DEFENDANT:  Yes, ma'am.

12              THE COURT:  Yes, sir.  Mr. Gray-Miller, have you had

13     enough time to discuss this matter with your attorney?

14              THE DEFENDANT:  Yes, sir.

15              THE COURT:  And are you satisfied with the

16     representation of your attorney?

17              THE DEFENDANT:  Yes, sir.

18              THE COURT:  Do you have any complaints of your

19     attorney or anyone else in connection with this case?

20              THE DEFENDANT:  No, sir.

21              THE COURT:  Have you and your attorney thoroughly --

22     excuse me.  Have you and your attorney thoroughly reviewed the

23     presentence report?

24              THE DEFENDANT:  Yes, sir.

25              THE COURT:  Okay.  You had a number of objections?

1          MR. GIBSON:  I do, Your Honor.

2          THE COURT:  I'll take them one at a time.  Okay.

3          MR. GIBSON:  As an overview, Judge, I have a number

4    of objections to facts that are alleged in the presentence

5    report.  Those facts generally relate to four actual things

6    that affect his sentencing guideline range.  They are that the

7    presentence report seeks to impose an enhancement upon

8    Mr. Gray-Miller for being an organizer/leader.  It seeks to

9    impose enhancement for him possessing a firearm.  It seeks to

10   impose enhancement on him for threatening a co-conspirator.

11   And it also lots or assigns to him, imposes upon him a range

12   of a drug weight of 50 pounds when we believe that the proper

13   drug weight attributed to Mr. Gray-Miller should be 12 pounds.

14          Now, with those four things --

15          THE COURT:  On that last one as I recall from my

16   last review of the presentence report, he and a co-defendant

17   went to California to buy drugs and brought back 50 pounds.

18   Two of them brought 50 pounds of marijuana together and put it

19   in suitcases for each other and put it in the car together,

20   didn't he?

21          MR. GIBSON:  Yes, Your Honor.

22          THE COURT:  All 50 pounds?

23          MR. GIBSON:  Yes, sir.

24          THE COURT:  So he was -- but he said actually

25   ownership of it, that he didn't own all of it.  The other man

1  owned part of it.

2          **MR. GIBSON:**  He owned 12 pounds of it, Your Honor.

3          **THE COURT:**  And the other man owned the other.  But

4  he doesn't deny then that they all brought it back together?

5          **MR. GIBSON:**  No, Your Honor.  He doesn't.  Your

6  Honor, with that said --

7          **THE COURT:**  So he facilitated the bringing of the

8  total amount?

9          **MR. GIBSON:**  That particular objection, Your Honor,

10  we will withdraw that objection --

11          **THE COURT:**  Okay.

12          **MR. GIBSON:**  -- and seek to address it as a variance

13  which I've set forth in my sentencing memorandum.

14          **THE COURT:**  That's fine.  So that's withdrawn.

15          **MR. GIBSON:**  Yes, sir.

16          **THE COURT:**  Moving on to your next one.

17          **MR. GIBSON:**  Well, Judge, I don't believe that there

18  is sufficient facts in this particular case to justify any of

19  those other three enhancements.

20          **THE COURT:**  Well, take them one at a time.

21          **MR. GIBSON:**  Well, just to be clear, Judge, it's my

22  understanding if I'm disputing the facts of it that the burden

23  will shift to the government to actually produce evidence

24  establishing those facts.  Now what I'm saying is that there

25  are not sufficient facts to do it.  And I've been very clear

1    in my objections as to which of those facts which I --

2         THE COURT:  The presentence report quotes the

3    witness and what he says for the Court's edification on

4    sentencing.

5         MR. GIBSON:  And what I'm saying, Judge, those

6    witnesses are lying.

7         THE COURT:  What?

8         MR. GIBSON:  That they are lying.

9         THE COURT:  Okay.

10         MR. GIBSON:  Now, what is occurring in this case,

11    Judge, is Jaondre Collier and Tyree Smith, the other

12    co-defendant, the one who is here to testify, they are

13    cousins.

14         THE COURT:  Pardon?

15         MR. GIBSON:  They are cousins.  They are family

16    members.  Family members.  And, Judge, from the very beginning

17    in this case they have been conspiring with each other to try

18    to minimize liability upon themselves and to place as much

19    blame as possible upon Mr. Gray-Miller.  In accordance with

20    that, Judge, they have come up with a story worth saying that

21    Tyree Smith was a drug mule in this particular instance, which

22    that does not hold water.  It is not what happened.

23    Tyree Smith in this particular case was in California.  He was

24    drug dealing.  He admitted to Special Agent Dunn in this

25    particular case that he was dealing drugs, dealing marijuana

1    himself as early as 2020, two years before this incident

2    occurred.  When he went to California it was not to act solely

3    as a drug mule.  It was to purchase three pounds of marijuana

4    for himself and then transport that marijuana back.  He has

5    been in a number of situations.  Made that trip a number of

6    times with his co-defendant, Jaondre Collier.

7              May I approach, Your Honor?

8              THE COURT:  Yes.

9              MR. GIBSON:  Would you pass that to the Court,

10   please.

11             Judge, I'm handing to you a photograph which I seek

12   to admit as Defendants Exhibit 1, a picture of Jaondre Collier

13   in a hotel room in California with a sizeable quantity of

14   marijuana packaged with him.  When Tyree Smith was asked --

15             THE COURT:  I don't know where did this picture come

16   from?

17             MR. GIBSON:  Came from Special Agent Dunn, Your

18   Honor.

19             THE COURT:  Okay.

20             MR. GIBSON:  Special Agent Dunn during his proffer

21   confronted Tyree Smith with this particular picture, asked him

22   what it was.

23             THE COURT:  Who is this supposedly in the picture?

24             MR. GIBSON:  This is Jaondre Collier.  His cousin.

25   The co-defendant.  Another co-conspirator.

1      **THE COURT:**  Okay.  How does the government wish to

2  proceed on this?

3      **MR. SCHOEN:**  Well, Your Honor, I think the challenge

4  is that, I mean, short like -- I have a witness here who can

5  address specific facts, but we could be here all day trying

6  this case because essentially --

7      **THE COURT:**  We could just set this for a trial on

8  the -- it may take a couple of days, but we can do it.  I

9  don't know how it's going to play out, if that's what the

10  defendant wants.  I may have to do that.  But also as you know

11  in sentencing, I don't have to -- it's not -- it's a different

12  burden of proof.

13      **MR. SCHOEN:**  Your Honor, and that's correct.  I

14  think that most of these objections -- I debated strongly, do

15  I need to call a witness at all because I think most of these

16  objections are dealt with adequately by the admitted conduct.

17  I'll point out one that I think is -- there's a statement

18  about the firearm.  Mr. Gibson says that there's an

19  enhancement applied because Mr. Gray-Miller possessed a

20  firearm.  That's not what the enhancement actually requires.

21  It requires that a firearm was possessed.  And it's sufficient

22  that the co-defendant possessed a firearm and that that was

23  reasonably foreseeable to Mr. Gray-Miller.  So I guess I point

24  that out just to say, I'm not going to put a witness up here

25  again and recount.  Like, one, this witness has got limited

1   knowledge.  He's got what he knows.  And I don't want to put

2   on the entire case.  I'm happy to have him address specific

3   facts.  But I think that it would be helpful to sort of narrow

4   down where it is that we have a dispute.  I don't dispute this

5   Jaondre Collier.  I agree.  He's a marijuana dealer.  I agree

6   that's him with a whole bunch of marijuana.

7             THE COURT:  Do we know who took the picture?

8             Did the defendant take the picture?

9             MR. SCHOEN:  I don't think this defendant took the

10  picture.

11            MR. GIBSON:  He took the picture, Your Honor.

12            MR. SCHOEN:  Mr. Smith took the picture.

13            MR. GIBSON:  Mr. Smith took the picture, Your Honor.

14            THE COURT:  Of Collier.

15            MR. SCHOEN:  Yeah.  He's out there.  Just the fact

16  he says he's a drug mule doesn't mean that he's not involved

17  with this business.  I don't think --

18            THE COURT:  You've got co-defendants and witnesses

19  and whatever.  Pretty obvious -- it's pretty obvious it's a

20  big time drug distribution conspiracy.  You know, you fly to

21  California with cash.  Jaondre says it's not real.  It's

22  legit.  We'll get into that later if necessary.  But these

23  were big time drug dealers, whatever.  And so we can -- I'm

24  just wondering how to go about all this.  I don't know.

25            MR. GIBSON:  I'm prepared to go just like I'm doing

1   now, Judge.

2           THE COURT:  I don't know what his position is, what

3   he pled guilty to.

4           MR. GIBSON:  Judge, I could tell you what happened

5   in this particular case.

6           THE COURT:  Okay.

7           MR. GIBSON:  So Raquentin makes reference.  He has a

8   relationship with Jaondre Collier through music.  That is --

9           THE COURT:  Let's talk about the music.

10          MR. GIBSON:  Say again, Your Honor?

11          THE COURT:  He says upon interview, he said he was

12  in the music business.

13          MR. GIBSON:  Yes, Your Honor.

14          THE COURT:  Has he filed any income tax return

15  showing income tax from the music business?

16          MR. GIBSON:  I don't believe he has, Your Honor.

17          THE COURT:  Well, he says he's in the music

18  business.  Going to California to film and bringing back

19  multiple kilos of drugs.

20          MR. GIBSON:  They say that as well, Your Honor.

21  Tyree Smith says that they went out there to film videos.

22  Jaondre Collier --

23          THE COURT:  All of them say they're in the music

24  business.

25          MR. GIBSON:  Raquentin, Your Honor, has songs on

1    Apple Music for sale.  I have a witness, Joe Brown, who is

2    prepared to testify and confirm that Mr. Gray-Miller performs

3    in clubs for payment.

4              **THE COURT:**  What's the significance of that?  He's

5    not charged with not paying income tax.

6              **MR. GIBSON:**  Well, no, Your Honor, he's not.

7              **THE COURT:**  Don't interrupt me.

8              He's not charged with not paying income tax on his

9    alleged music business.  He's charged with taking cash to

10   California and buying drugs and bringing them back to South

11   Carolina.

12             **MR. GIBSON:**  The point that I'm trying to make, Your

13   Honor, is that he went there initially to make videos.  He

14   brought cash with him.  When they got to Miami, Jaondre

15   Collier said that we're going to buy some marijuana when we

16   get to Los Angeles.  He traveled to Los Angeles.

17             Judge, I am in no way whatsoever contesting that

18   Raquentin Gray-Miller was involved in the purchase of

19   marijuana with the intent to sell it.  I am in no way

20   whatsoever contesting that he conspired with Jaondre Collier

21   and Tyree Smith to transfer that marijuana back to South

22   Carolina for sale.  What I am contesting is that Raquentin

23   Gray-Miller was not organizer, manager, leader of this

24   particular conspiracy.  What I am contesting is that

25   Raquentin --

1      THE COURT:  Well, he's saying he's not, so --

2          MR. GIBSON:  Yes, Your Honor.  He's saying he's not.

3          THE COURT:  And they're saying he is.

4          MR. GIBSON:  What I'm saying is that the facts that

5  they are relying upon are not actual truth.  Okay.  I mean,

6  that's what I'm saying.  And with that said, Judge, I know

7  that this is not the same burden as a trial.  It's not beyond

8  a reasonable doubt.  But the burden still rests upon them.

9  Now with that said, Judge, I can go through -- it's a

10  preponderance of the evidence burden, Judge, and the burden is

11  on the state.  It's not upon me.  Not upon me to do that.

12  It's upon the state.  It's upon the government.

13          THE COURT:  Well, you don't question what the Court

14  has in its report that the probation office reported to the

15  Court that witnesses say certain things.

16          MR. GIBSON:  I am absolutely saying that they said

17  those things.  But those things are lies.

18          THE COURT:  And you're saying when the defendant

19  says something is a lie, then the burden shifts to the

20  government to --

21          MR. GIBSON:  It's not a matter of a shift, Judge.

22  Well, I guess if I dispute it then the burden falls to the

23  government to prove it.  Now, the burden that they have to

24  prove it is preponderance of the evidence, but they have to

25  prove it.  And what -- and, Judge, I can actually, I can make

1   the arguments based upon, you know, what's in the proffer
2   agreements and upon everything I'm going to show as far as him
3   lying in this particular case.  He has lied repeatedly in this
4   case.  The point I'm trying to make about that, Judge, is that
5   because he's told so many lies, he should not be seen as
6   credible as to these other matters.  Now, he claims that --
7            THE COURT:  When you say "he," you're talking about
8   Mr. Smith?
9            MR. GIBSON:  Tyree Smith, Judge, who is the only
10   witness that I'm aware of that they have who's going to
11   testify at this particular hearing.
12            MR. SCHOEN:  That's correct.
13            MR. GIBSON:  I was told Jaondre Collier was going to
14   show up, but Jaondre Collier is not here.
15            THE COURT:  Are you proposing to go ahead and call
16   your witness?
17            MR. SCHOEN:  I'm happy to call him, Judge.
18            THE COURT:  I'm not saying you have to.
19            MR. SCHOEN:  I'm just worried about a situation
20   where he said, I plead guilty and I get acceptance of
21   responsibility, but I dispute every single fact in here.  So
22   therefore it becomes the government's burden to bring every
23   witness in here to testify.
24            THE COURT:  Wait a minute.  You can't talk but one
25   at a time.  I agree with you on that.

1          Yes, sir.

2          **MR. GIBSON:**  Your Honor, my client was charged with

3    three counts in this particular case.  He was charged with a

4    924(c).  He was charged with a conspiracy to possess and with

5    distributing marijuana.  And he was charged with a possession

6    with intent to distribute marijuana.  From the very get-go we

7    had a detention hearing in this particular case.

8    Judge McDonald denied their request for detention and allowed

9    my guy to have bond.  Right after that hearing I went to

10   Mr. Schoen and said, hey, listen, let's start talking about a

11   plea to the drug charges.  This has never been a case of my

12   client trying not to accept responsibility for what he's done.

13   What we had a problem with, Your Honor, was accepting

14   responsibility for a 924(c) when my client is not guilty of a

15   924(c).

16          Now, we went round about, they had a number of

17   situations where they kept having new indictments and it kept

18   getting delayed and delayed and delayed.  But when it became

19   time to actually put it at trial and have a trial with a jury

20   as to whether or not my client should be held accountable for

21   a firearm, that's when I got the offer that, hey, we'll drop

22   the 924(c) and your client can plead to the drug charges.

23          My client stands fully ready.  He has done so

24   already.  He continues to do so to accept responsibility for

25   his particular actions in this case.  But what they're saying

1     is this, they're saying if he pleads to a drug charge, then we

2     can say whatever we want about him.  And if he denies it, if

3     he says that didn't happen, then somehow or another he's not

4     accepting responsibility for his actions in the case.  All

5     right.  And that's just not -- that's not right.  I mean,

6     whether it's the law or whatever, that's just not right.

7          THE COURT:  Before we go any further -- if we were

8     going to go any further, which I guess we are, but I would

9     tell the defendant to be careful because -- well, I had a case

10    recently in which a defendant making statements to the Court,

11    the Court was required to deny his acceptance of

12    responsibility for what he said.  So, I'm not saying -- I

13    almost feel like in the future I almost need to admonish every

14    defendant to be careful because as you know at sentencing the

15    defendant has the right of allocution to be heard.  And I can

16    hear from the defendant.  But it can be a slippery slope if

17    they start backtracking too much on what they've already

18    admitted to under oath that they did.

19         MR. GIBSON:  Yes, Your Honor.

20         Your Honor, normally, I mean, I get presentence

21    reports all the time with things I disagree with.

22         THE COURT:  With what?

23         MR. GIBSON:  With things that I disagree with.

24    Allegations, enhancements, whatever, you know.  And I'm like,

25    okay, we'll just handle it as a variance.  But Your Honor, in

1    this particular case, it's so egregious.  And let me tell you

2    what my real concern is.  As I set forth in my sentencing

3    memorandum, Judge, I believe that the appropriate sentence for

4    him is roughly about six months of either home detention or

5    incarceration.  But the problem is this, when you start off

6    with sentencing guidelines at the range that they've got them

7    at, I get that response.

8            THE COURT:  How much drugs did he contend that he

9    bought in California and brought back to South Carolina?

10           MR. GIBSON:  12 pounds.

11           THE COURT:  12 pounds?

12           MR. GIBSON:  Yes.

13           THE COURT:  How many kilos is that?

14           MR. GIBSON:  That's 4,553 grams, so 4.4-and-a-half

15   kilos.

16           THE COURT:  What kind of money did he pay the drug

17   dealer in California?

18           MR. GIBSON:  I'm sorry, say again, Your Honor?

19           THE COURT:  What did he pay the drug distributor in

20   California for those drugs that he was going to bring back?

21           MR. GIBSON:  He paid roughly $650 per pound.  So

22   about 70 -- whatever that comes out, Judge.  650 times 12.  So

23   $7,800, Judge.

24           THE COURT:  $7,800 in cash, which he admits now that

25   he didn't make in the music industry, made from where?

1          MR. GIBSON:  He has three jobs.  He had three jobs

2     at the time.  He worked as a -- he got --

3          THE COURT:  He's not going to take the position, is

4     he, that this is the first time he ever bought drugs?

5          MR. GIBSON:  Oh, no, Your Honor.  No, Your Honor.

6          THE COURT:  He's a drug dealer going back and forth

7     to California.

8          MR. GIBSON:  And quite frankly, Judge, I've been

9     doing this for 20 something years and --

10          THE COURT:  I know you've been doing this a long

11    time.  I have too.  You say maybe I ought to just pat him on

12    the back, give six months and say go on about your business.

13          MR. GIBSON:  What I'm saying, Judge, is that based

14    upon the appropriate calculation of his guidelines, based upon

15    what I set forth in my sentencing memorandum, he should get

16    about the same sentence that Maurice Deon Bynum got, which was

17    six months.  That's what I'm saying.

18          THE COURT:  I can't -- refresh my memory.

19          MR. SCHOEN:  You gave Mr. Bynum the very top of the

20    guidelines.  He got a six-month sentence.  He didn't have any

21    criminal history.  He did not get into a car where people had

22    guns.  He was trying but --

23          THE COURT:  I gave him a guideline.

24          MR. SCHOEN:  You gave him the top of the guideline

25    sentence, Your Honor, even though they asked for a downward

1   variance.  And we don't have --

2           THE COURT:  We're having a colloquy here.  We need

3   to move on --

4           MR. SCHOEN:  Yes, Your Honor.

5           THE COURT:  -- and resolve these disputes.

6           MR. SCHOEN:  I'll call the witness to testify.

7           THE COURT:  Why don't you just call him.

8           MR. SCHOEN:  All right.  The government calls

9   Mr. Tyree Smith to the stand.

10          THE CLERK:  Step here to be sworn.  Raise your right

11  hand.

12              WITNESS - TYREE SMITH - DULY SWORN

13          THE WITNESS:  Yes, ma'am.

14          MR. GIBSON:  Excuse me, Your Honor.  May I have a

15  few minutes to confer with my client?

16          THE COURT:  Sure.

17          (Whereupon, Mr. Gibson confers with the defendant.)

18          MR. GIBSON:  We're ready to proceed, Your Honor.

19          THE COURT:  You may proceed.

20              DIRECT EXAMINATION BY THE PLAINTIFF

21  BY MR. SCHOEN

22  Q    Can you state your name, please.

23  A    Tyree Smith.

24  Q    Mr. Smith, how old are you?

25  A    22.

1   **Q**   Back in on January 25th, 2022, how old were you then?

2   **A**   2022?

3   **Q**   Yeah.  On the day you got shot, how old were you?

4   **A**   21.

5   **Q**   Having just turned 21, or how long had you been 21?

6   **A**   About five days.

7   **Q**   Five days.  Just 21 years old.

8       And you went out with Mr. Collier and Mr. Gray-Miller

9   to California; is that right?

10  **A**   I went out with you say what?

11  **Q**   You went out to California with Mr. Collier.

12  **A**   Yeah.

13  **Q**   Okay.  Mr. Gray-Miller who's sitting near the

14  courtroom, was he with you too?

15  **A**   I think so.

16  **Q**   Yep.  You think so?

17  **A**   Uh-huh.

18  **Q**   Was he with you or was he not?

19  **A**   On the flight?

20  **Q**   Out in California.

21  **A**   It was all out there.

22  **Q**   Say that again?

23  **A**   You said did we go out together or was we all out

24  there?

25  **Q**   You were all out there?

1  **A**    We were all out there.

2  **Q**    And while you-all were out there you bought some

3  marijuana, right?

4  **A**    Yeah.

5  **Q**    Who paid for the marijuana?

6  **A**    I mean, what you mean?  What marijuana?

7  **Q**    The marijuana you purchased, who paid for it?

8  **A**    I mean, everybody paid for their own.

9  **Q**    Everybody paid for their own.  Mr. Gray-Miller pay

10  for some?

11  **A**    I guess so.  I don't know.  I don't know what he did.

12  They could have gave it to him.  I don't know if he paid

13  for it or not.

14  **Q**    You came home with two suitcases in your name, right?

15  **A**    Yeah.

16  **Q**    But not all that stuff was yours, was it?

17  **A**    Nope.

18  **Q**    Nope.  Did someone pay you or tell you they were

19  going to pay you in order to carry one of the bags?

20  **A**    I mean, I was told.

21  **Q**    You were told that you were going to be paid to carry

22  a bag, right?

23  **A**    Yeah.

24  **Q**    Who told you that you were going to be paid to carry

25  a bag?

1  **A**    I mean, whoever bag it was.  I don't really know what

2  was in there.

3  **Q**    Who told you they would pay you to carry a bag?

4  **A**    I mean, I don't know.

5  **Q**    You've got to answer with words.

6  **A**    Okay.  Who told me?

7  **Q**    Who said they would pay you in order to carry a bag?

8  **A**    Man --

9  **Q**    Are you afraid?

10  **A**    I ain't afraid.

11  **Q**    Did you previously have a conversation where you

12  talked to the FBI about what happened out there?

13  **A**    You say what?

14  **Q**    You previously talked to an FBI agent about what

15  happened out here?

16  **A**    Yeah.

17  **Q**    Who did you tell the FBI agent paid you in order to

18  carry that bag or offer to pay you?

19  **A**    I mean, Miller.

20  **Q**    Mr. Gray-Miller?

21  **A**    Yeah.

22  **Q**    Yes?

23  **A**    (Witness moves head up and down.)

24  **Q**    Okay.  Why did -- why wasn't he carrying his own bag?

25  **A**    I don't know.  I think something wrong with his card

22

1  or something.  Something wrong with his ID card or

2  something, I don't know.

3  **Q**    He said something was wrong with his ID card so he

4  paid you and told you to carry the bag; is that right?

5  **A**    He wasn't paying me to carry the bag.  Something

6  wrong with his card.

7  **Q**    Did he tell you he would pay you because you were

8  carrying his bag?

9  **A**    I mean, kind of, sort of.

10  **Q**    Yes or no?  Was it your understanding that he was

11  going to pay you for carrying his bag?

12  **A**    Yeah.

13  **Q**    Yes.  Okay.  All right.  And when you landed, you and

14  Mr. Gray-Miller got those suitcases and walked out to a

15  car being driven by Jaondre Collier, right?

16  **A**    Uh-huh.

17  **Q**    Is that a Dodge Challenger?

18  **A**    I think so, yeah.

19  **Q**    How many doors are on that Dodge Challenger?

20  **A**    Two.  Two doors.

21  **Q**    A couple.  All right.  So who gets in what seats?

22  **A**    I think --

23  **Q**    Where were you sitting?

24  **A**    I'm behind the driver seat.

25  **Q**    You're behind the driver seat?

1    **A**    Uh-huh.

2    **Q**    Where is Mr. Gray-Miller sitting?

3    **A**    On the other side.

4    **Q**    Next to you?

5    **A**    Yeah.

6    **Q**    Two grown men sitting in the back of a coup; is that

7    right?

8    **A**    Yeah.

9    **Q**    All right.  Now, once you guys are all in the car and

10   you put the suitcases in the trunk, what did Mr. Collier

11   hand you?

12   **A**    He hand me my weapon.

13   **Q**    He handed you a weapon?

14   **A**    My weapon.

15   **Q**    Your weapon.  You weren't saying that's anybody

16   else's weapon, it was your weapon?

17   **A**    It was mine.

18   **Q**    Was Mr. Gray-Miller sitting right next to you when

19   Mr. Collier handed you that weapon?

20   **A**    You say was he?

21   **Q**    Yes.

22   **A**    I mean, we just got in the car.  Where else you going

23   to be?

24   **Q**    You're both sitting right next to each other in the

25   back of a coup when he handed you a gun?

1    **A**    Yeah.

2    **Q**    Okay.  So then you-all pull into the parking garage.

3    This parking garage is maybe a few hundred yards from the

4    terminal; is that correct?

5    **A**    I guess so.  I don't know.

6    **Q**    So instead of just walking his -- Mr. Gray-Miller's

7    car was parked in that parking garage, wasn't it?

8           **MR. GIBSON:**  Objection, leading.

9           **THE COURT:**  Overruled.  Go ahead.

10   BY MR. SCHOEN

11   **Q**    Do you know why you drove into a parking garage?

12   Were you planning to drop something in the parking garage?

13   **A**    I didn't know his car was there.  I ain't know

14   nothing about his car being there.

15   **Q**    After you were shot, were you put in somebody else's

16   car?

17   **A**    That was after the fact.  I didn't know it was a car

18   for him.

19   **Q**    I'm not asking what you knew ahead of time.

20   Afterward were you put in somebody's car after you got

21   shot?

22   **A**    Yeah.

23   **Q**    Okay.  And whose car is it that you were put into?

24   **A**    It was his car.

25   **Q**    Mr. Gray-Miller's car?

1    **A**    In Miller's car.

2    **Q**    So his car was in that parking garage?

3    **A**    Yeah.  After I got shot.  That's when I realize --

4    **Q**    Right.  That's all I'm asking.

5         Your car was not in the parking garage?

6    **A**    No.

7    **Q**    Mr. Collier's car was not in the parking garage as

8    far as you know because he was driving, right?

9    **A**    Yeah.

10   **Q**    So you-all were driving -- the only person who had a

11   car parked in that parking garage was Mr. Gray-Miller?

12   **A**    Uh-huh.

13   **Q**    So you-all were driving all of like a few hundred

14   yards from the front of that terminal into that parking

15   garage to drop Mr. Gray-Miller off at his car, right?

16   **A**    Uh-huh.

17   **Q**    And as you were trying to get -- as someone is trying

18   to get the suitcases out of the back of that car, that's

19   when the shooting happened, right?

20   **A**    Something like that, yeah.

21   **Q**    Were they taking the suitcase out of the back of the

22   car?

23   **A**    Who?

24   **Q**    Was the trunk open?  Was Mr. Collier pulling one or

25   more of those suitcases out of the car?

1  **A**    I really wasn't paying attention.  I'm in the car.  I

2  ain't really -- I think so.  I don't know.

3  **Q**    Okay.  And then these guys came in and they tried to

4  rob you.

5  **A**    Yeah.

6  **Q**    You end up getting shot.

7  **A**    (Witness moves head up and down.)

8  **Q**    All right.  Now, after this whole --

9          **THE COURT:**  Wait a minute.  I want to ask him a

10  question.

11          Mr. Smith, where were you when you got shot?

12          **THE WITNESS:**  I was getting out of the car.

13          **THE COURT:**  Were you already out of the car or in

14  the process of getting out of the car?

15          **THE WITNESS:**  I was in the process.

16          **THE COURT:**  Do you know who shot you?

17          **THE WITNESS:**  I don't know, no.

18          **THE COURT:**  Go ahead.

19  **BY MR. SCHOEN**

20  **Q**    Now, it was said -- and you were present in the

21  courtroom when Mr. Gibson was talking about what happened

22  in this case, weren't you?  You heard Mr. Gray-Miller's

23  lawyer make some comments?

24  **A**    You mean today?

25  **Q**    Yeah.

1    **A**    Yeah.

2    **Q**    He said that you and Jaondre Collier got together and

3    concocted a story to tell the government.  Is that true?

4    **A**    You said we made a story?

5    **Q**    That the two of you got together and decided to lie

6    to the government; is that right?

7    **A**    I mean, we in prison.  How we going to get together

8    about making a story, through the phone?  I don't recall

9    that, no.

10   **Q**    Did you and Mr. Collier concoct a story to tell the

11   government?

12   **A**    No.

13   **Q**    But, in fact, you actually were given a story that

14   somebody else wanted for you to tell the government at one

15   point, isn't that right?

16   **A**    Again, it was state charges.  It wasn't fed.

17   **Q**    So you got some state charges in connection with this

18   offense?

19   **A**    Yeah.

20   **Q**    Yes?

21   **A**    (Deponent moves head up and down.)

22   **Q**    And who paid for your lawyer?

23   **A**    I mean, my cousin and him.

24   **Q**    Your cousin.  And who's him?

25   **A**    Miller.

1  **Q**    So Collier and Gray-Miller paid for your lawyer on

2  the state charges, right?

3  **A**    Uh-huh.

4  **Q**    And the two of them cooked up a statement for you to

5  give to the state about what happened, right?

6  **A**    I don't know want to say.  They did it like -- it was

7  somebody else that made that story.

8  **Q**    Somebody else made the story up?

9  **A**    Yeah.

10  **Q**    They communicated to you that they wanted you to tell

11  the state that particular story, right?

12  **A**    Was all trying to figure something out.

13  **Q**    You guys were trying to figure it out?

14  **A**    Yeah.

15  **Q**    Okay.  And when we talked with Special Agent Dunn

16  with the FBI, he got -- he took your phone, right?

17  **A**    Uh-huh.

18  **Q**    And he dumped text messages off your phone.

19  **A**    Yeah.

20  **Q**    And in those text messages was a text message from

21  Mr. Gray-Miller to you specifying what you were supposed

22  to tell the state authorities; isn't that right?

23  **A**    You say what?

24  **Q**    In your cell phone when he dumped the messages off

25  your cell phone, he found a message from Mr. Gray-Miller

1    to you giving you a story that you were supposed to tell

2    state authorities?

3    **A**    Yeah.  I don't think he came up with that though.  It

4    was somebody else that did that.

5    **Q**    But he sent you a text message with the story he

6    wanted told, right?

7    **A**    Something like that.

8         **MR. SCHOEN:**  And -- I'll hand you a copy of this if

9    you want to see it.  Messages from discovery.

10         Your Honor, approaching the witness with what's been

11    previously marked as Government's Exhibit 1.  We'd ask that

12    this be moved into evidence.  I've shown it to opposing

13    counsel.

14         **THE COURT:**  In evidence.  You can hand me a copy of

15    it.

16    (Whereupon, Plf. Exh. No. 1 is admitted.)

17    **BY MR. SCHOEN**

18    **Q**    All right.  Mr. Smith, if you look at the first page

19    on that set of documents that I handed you, I think it

20    says page 47 at the bottom.  You see a text string in

21    blue.  You see what I'm talking about in the middle of the

22    page?

23    **A**    Yeah.

24    **Q**    Is that the story that they wanted you to tell the

25    state authorities?

1    **A**    Yes.  Something came up together.

2    **Q**    That Mr. Gray-Miller sent to you?

3    **A**    Yeah.  It came from his phone, but --

4    **Q**    It came from his phone, right?

5    **A**    Yeah.

6    **Q**    Let me read out.  You read quietly while I read aloud

7    what it says:  I, Tyree Laquan Smith, on January 25th of

8    2022, was the sole occupant of all products seized on the

9    day of the incident.  I also was in possession of a Glock

10   43 firearm.  No other persons that was charged knew of

11   intentions that took place.  Again, I'm aware of my

12   wrongdoings and take full responsibility for my actions.

13   I'm coming forth to clear all misunderstandings.  I was

14   arrested by Spartanburg County authorities and told

15   officers the day of arrest the exact same thing I'm

16   stating now.  It went unheard.

17          Did I accurately read that, Mr. Smith?

18   **A**    Yeah.

19   **Q**    Now, Mr. Smith, it's not true that you were the only

20   one who knew what was in those suitcases, is it?

21   **A**    You said it's not true?

22   **Q**    You were not the only one who knew what was in those

23   suitcases?

24   **A**    I mean, I guess so.  I don't know.

25              **THE COURT:**  I think we need to just -- I'm going to

1   go by the -- you can examine him if you want to.  We could be

2   here all day.  He's hemming and hawing and just -- he's not

3   answering the questions, and I can rely upon the reports that

4   have been made.

5          MR. SCHOEN:  I agree, Judge.  But can I ask him one

6   additional question?

7          THE COURT:  One more.  This is ridiculous.  I don't

8   know who he's trying to fool.  It's so obvious to me what

9   you're doing.  Go ahead.

10          MR. SCHOEN:  I think he's scared.

11          THE WITNESS:  I ain't scared.  I've been shot.  I

12   ain't -- a lot of this stuff I was under the influence.

13          THE COURT:  I'm sorry?  You've been shot and you're

14   under the influence?

15          THE WITNESS:  I said I was under the influence.  All

16   this stuff, I don't remember all this stuff.

17   BY MR. SCHOEN

18   Q    Mr. Smith, when you didn't tell state authorities

19   this story, did Mr. Gray-Miller say to you that you might

20   have to be whacked or he might have to get you touched?

21   A    It was about something else.  It wasn't about this.

22   It was about something else.

23   Q    It was about something else?

24   A    Yeah.

25   Q    What was it about?

1    A     Some other stuff.

2              THE COURT:  What other stuff?

3              THE WITNESS:  It ain't got nothing to do with this

4    case.  It ain't got nothing to do with this case.

5              THE COURT:  What did it have to do with?

6              THE WITNESS:  What you mean?

7              THE COURT:  You said it had to do with something

8    else?  What else did it have to do with?

9              THE WITNESS:  It was about something else.

10             THE COURT:  What else?

11             THE WITNESS:  I don't --

12             THE COURT:  Answer my question.

13             THE WITNESS:  I just told you, I don't know.  It was

14   about something else.

15             THE COURT:  What else?

16             THE WITNESS:  I got on my phone as a message.

17             THE COURT:  What?

18             THE WITNESS:  I don't know, bro.  I don't know.

19   BY MR. SCHOEN

20   Q     Did you tell the FBI that he said he was going to

21   have you whacked or touched if you didn't submit this

22   statement?

23   A     You said that I what?

24   Q     Did you tell the FBI that he said he was going to

25   have you whacked or touched if you did not provide this

1  statement to state authorities?

2  **A**   Not that I remember.  Not that I recall.

3          **MR. SCHOEN:**  No further questions.

4          **MR. GIBSON:**  Judge, I have a few.

5          **THE COURT:**  Okay.  I mean, he'll answer in his favor

6  whatever you want him to, but ask him.  We're not going to go

7  long on this witness.

8          **MR. GIBSON:**  I understand.

9                  **CROSS EXAMINATION BY THE DEFENSE**

10 BY MR. GIBSON

11 **Q**   Mr. Smith, isn't it in fact true you did not work for

12 Raquentin Gray-Miller?

13 **A**   Did I work for him?

14 **Q**   You did not work for Raquentin Gray-Miller.  And you

15 were involved in the drug trade prior to this particular

16 trip, were you not?

17 **A**   Was I doing what?

18 **Q**   Were you selling drugs prior to 2000 -- January 2022?

19 **A**   I wouldn't say that, but...

20 **Q**   Let me ask you this.  Isn't it true that Raquentin

21 Gray-Miller did not recruit you into this particular case?

22 **A**   No.  That's a fact.  No, he's not recruiting me.

23 **Q**   He did not exercise any control over you?

24 **A**   No.

25 **Q**   He didn't tell you what to do, did he?

1    **A**    No.

2    **Q**    Now, you said that this thing, this gun was passed in

3    the car.  Isn't it in fact true that you told the agent,

4    the special agent in the case when you had your proffer

5    that you didn't know if Raquentin Gray-Miller had actually

6    seen this firearm being passed or not?  Didn't you say

7    that?

8    **A**    Yeah.

9    **Q**    And is that true still today, you still don't know if

10   he saw you with this firearm in the back seat?

11   **A**    I think he was on his phone.  I don't know what he

12   seen.

13            THE COURT:  They got to him.

14   **BY MR. GIBSON**

15   **Q**    And it is your -- strike that.  Nothing further.

16            THE COURT:  You may step down.  Take him back to his

17   cell.  I think they got to him.  That's fine.  What else you

18   got?

19            MR. SCHOEN:  Judge, I don't have a whole lot more,

20   but I think that what he gave me is enough to carry those

21   particular objections.  And I'd like to argue that if the

22   Court will hear.

23            THE COURT:  Are you relying on that witness to

24   support what?

25            MR. SCHOEN:  Well, Your Honor, I think he clearly

1   didn't want to cooperate with me, but I think he admitted that

2   this particular text did come from Mr. Gray-Miller to his

3   phone.  And this particular text says that he was essentially

4   the sole person responsible, but that no one else knew

5   anything about that.  Mr. Gray-Miller came in here and pled

6   guilty to possession with intent to distribute marijuana,

7   again, with conspiracy.  So clearly this was false.

8           **THE COURT:**  How does this apply to anything in the

9   guidelines?

10          **MR. SCHOEN:**  Pardon?

11          **THE COURT:**  How does this apply to anything in the

12  guidelines?

13          **MR. SCHOEN:**  Your Honor, it applies because it shows

14  that he is sending a statement to a witness to try to coach

15  that witness to give false information to --

16          **THE COURT:**  What part of the guidelines are you

17  referring to?

18          **MR. SCHOEN:**  That has to do with the obstruction

19  enhancement.  He got an enhancement for attempting to --

20          **THE COURT:**  I think you've clearly established that

21  based on that text.

22          **MR. SCHOEN:**  Yes.

23          **MR. GIBSON:**  Your Honor, the guidelines as they were

24  proposed and presented to us gave him obstruction of

25  justice -- or gave him that enhancement based upon two

1   factors.  It said, one, that he was a organizer, manager, or
2   leader.  Then it said that it was based upon him threatening
3   Tyree Smith.  Tyree Smith has come up and said he did not
4   threaten him as part of that -- this particular case at all.
5   Tyree Smith has said that Raquentin Gray-Miller did not
6   control him.  He did not employ him.  He did not recruit him
7   into this thing.
8          THE COURT:  I understand that, but what has been
9   established is that he sent an email telling Smith to take
10  credit for the -- well, what it says is, that he was the sole
11  occupant of all products.  He's telling Smith -- your client
12  is telling Smith to take the rap for all the drugs.
13         MR. GIBSON:  Again, Your Honor, as to your question,
14  what specific guideline does that apply to?  Because the
15  guideline that was submitted to me in --
16         THE COURT:  That's what I want to know, yes.
17         MR. GIBSON:  -- preparation for this hearing was the
18  guideline that I'm telling you about right now.  And I think
19  his testimony established, one, conclusively that Raquentin
20  Gray-Miller was not a manager, organizer, or leader.  And two,
21  that he did not threaten him.  So based upon both of those
22  things, Judge, that guideline that was submitted as part of
23  the proposed PSR cannot apply in this particular case.  As to
24  the firearm what they're saying is that it was foreseeable to
25  or Raquentin Gray-Miller that a firearm was there.  Miller

1   didn't see him pass that firearm, Judge.  And he can't testify

2   as to that.  Raquentin Gray-Miller got in the car --

3           THE COURT:  What basis -- what basis do you say he

4   didn't see him pass the firearm?

5           MR. GIBSON:  Raquentin Gray-Miller got in the car

6   and got on his phone.  He didn't see a firearm being passed.

7           THE COURT:  On what basis are you saying that?

8           MR. GIBSON:  Judge, let me back up.

9           THE COURT:  Does he want to testify?

10          MR. GIBSON:  Not as part of this, Your Honor.

11          THE COURT:  I mean, you can't just make statements

12   to the Court, he didn't see, he didn't do.  On what basis?

13          MR. GIBSON:  We will testify, Your Honor.

14          THE COURT:  All right.  I have to give you this

15   warning.  You wait right there when I'm talking to you.

16          THE DEFENDANT:  Yes, sir.

17          THE COURT:  You're already under oath.  If you make

18   a false statement to a material matter you could be prosecuted

19   for perjury which is a separate criminal offense.  Do you

20   understand that?

21          THE DEFENDANT:  Yes, sir.

22          THE COURT:  Furthermore, if I find that you're

23   perjuring yourself or testifying falsely, you could lose

24   acceptance of responsibility.  Your guideline range would go

25   up significantly.  Do you understand that?

1        THE DEFENDANT:  Yes, sir.

2        THE COURT:  All right.  Go ahead and take the

3   witness chair.  Go ahead.  Ask him questions.

4              DIRECT EXAMINATION BY THE DEFENSE

5   BY MR. GIBSON

6   **Q**    Raquentin, when you got in the car did you see a

7   firearm being passed?

8   **A**    No, sir.

9   **Q**    What did you do when you first got in the car?

10  **A**    I got on my phone.

11  **Q**    Go ahead.

12  **A**    Scrolling on Facebook, Instagram.

13        MR. GIBSON:  Nothing further at this point, Your

14  Honor.

15        THE COURT:  You got any questions?

16        MR. SCHOEN:  No.

17        THE COURT:  I do.

18        The question is, when you came back from

19  California --

20        THE DEFENDANT:  Yes, sir.

21        THE COURT:  -- with multiple kilos of marijuana --

22        THE DEFENDANT:  Yes, sir.

23        THE COURT:  -- you went out there to buy drugs, and

24  you did, did you not?

25        THE DEFENDANT:  Yes, sir.

1          THE COURT:  And you paid for it in cash, did you

2    not?

3          THE DEFENDANT:  Yes, sir.

4          THE COURT:  And you got back and you were traveling

5    with Mr. Smith who just testified; is that right?

6          THE DEFENDANT:  Yes, sir.  I ain't even know he was

7    on the plane with me at first.

8          THE COURT:  Well, I didn't ask you that.  But you

9    didn't know he was on the plane with you?

10         THE DEFENDANT:  No.  I was in the back of the plane.

11   I didn't see him till I went down the escalator.

12         THE COURT:  Okay.  Well, one comment brings another

13   question.  Were you and he together out in California?

14         THE DEFENDANT:  Yes, sir.

15         THE COURT:  Okay.  You-all buy drugs together out

16   there?

17         THE DEFENDANT:  Yes, sir.

18         THE COURT:  He bought some and you bought some?

19         THE DEFENDANT:  Yes, sir.

20         THE COURT:  And you went to the airport together?

21         THE DEFENDANT:  No.  I went to the airport by

22   myself.

23         THE COURT:  How many bags did you take to the

24   airport?

25         THE DEFENDANT:  None.

1          THE COURT:  None?

2          THE DEFENDANT:  Uh-uh.

3          THE COURT:  What did you do with the marijuana that

4    you purchased in California?

5          THE DEFENDANT:  It was in a -- they packaged it up.

6          THE COURT:  Who is they?

7          THE DEFENDANT:  Tryee and Jaondre, I think.

8          THE COURT:  You've got to get closer to the

9    microphone.  I can't hear you.

10          THE DEFENDANT:  Tyree and Jaondre packaged it up.

11          THE COURT:  How did it get to the airport?

12          THE DEFENDANT:  I was already gone so I think they

13    drove it.

14          THE COURT:  They drove your drugs to the airport?

15          THE DEFENDANT:  It wasn't just mine.  It was --

16          THE COURT:  Okay.  You can dance around with me if

17    you want to.  You bought multiple kilos of drugs in

18    California, did you not?

19          THE DEFENDANT:  Yes, sir.

20          THE COURT:  And you weren't just going to give it to

21    people in California, were you?

22          THE DEFENDANT:  No, sir.

23          THE COURT:  You were going to bring it back to South

24    Carolina to sell it in South Carolina, were you not?

25          THE DEFENDANT:  Yes, sir.

1          THE COURT:  All right.  You bought these drugs.  And

2   how did your drugs that you bought, multiple kilos, how did it

3   get to the airport in California?

4          THE DEFENDANT:  They drove it.

5          THE COURT:  They drove it?

6          THE DEFENDANT:  Yeah.

7          THE COURT:  For you?

8          THE DEFENDANT:  Yes.

9          THE COURT:  You turned it over to them to drive it

10  to the airport; is that right?

11         THE DEFENDANT:  Yes.  Yes, sir.

12         THE COURT:  Okay.  So you and Smith got on the same

13  airplane; is that right?

14         THE DEFENDANT:  Yeah.  I was already there.  I was

15  already on the plane.  I didn't see him board or nothing.  So

16  I didn't really know he was on the same flight.

17         THE COURT:  You didn't know he was on the plane?

18         THE DEFENDANT:  Uh-uh.

19         THE COURT:  Where did you land, in Greenville --

20         THE DEFENDANT:  Yes, sir.

21         THE COURT:  -- or Charlotte?

22         THE DEFENDANT:  Greenville.

23         THE COURT:  Greenville.  Did you see him when you

24  got off the plane?

25         THE DEFENDANT:  I seen him when he was going down

1   the escalator.

2           THE COURT:  Were you surprised that he was on the

3   same plane with you?

4           THE DEFENDANT:  Yes, sir.

5           THE COURT:  You were surprised?

6           THE DEFENDANT:  Yes, sir.

7           THE COURT:  Did you-all talk about -- did you pick

8   up anything at the airport to go take it to your car?

9           THE DEFENDANT:  Did I pick up when I landed?

10          THE COURT:  After you landed.

11          THE DEFENDANT:  After I landed did I pick up --

12  yeah.  I helped him get his bags.

13          THE COURT:  You helped him get his bags?

14          THE DEFENDANT:  Uh-huh.

15          THE COURT:  Well, where was your marijuana?

16          THE DEFENDANT:  It was in the bags too.

17          THE COURT:  And in his bag?

18          THE DEFENDANT:  Yeah, it was.

19          THE COURT:  So he was bringing your marijuana for

20  you; is that right?

21          THE DEFENDANT:  Yes.  All of us had marijuana in

22  there, yes, sir.  All of us had marijuana.

23          THE COURT:  All of us.  Who is all of us?

24          THE DEFENDANT:  Me, Tyree and Jaondre.

25          THE COURT:  Tyree is Smith?

1     **THE DEFENDANT:**  Uh-huh.

2     **THE COURT:**  And who is Jaondre?

3     **THE DEFENDANT:**  He's the other guy that's on the

4     case with us.

5     **THE COURT:**  Was he on the plane with you?

6     **THE DEFENDANT:**  No.

7     **THE COURT:**  So you land at the airport.  And did you

8     see Smith when you got off the airplane?

9     **THE DEFENDANT:**  No.  I seen him when I was going

10    down the elevator, not when I got off the airplane.

11    **THE COURT:**  After you got off the airplane you saw

12    Smith?

13    **THE DEFENDANT:**  Yes, sir.

14    **THE COURT:**  Were these bags with your marijuana

15    checked bags or did you carry them on board the airplane?

16    **THE DEFENDANT:**  They was checked.

17    **THE COURT:**  They were checked.  And they were

18    checked by Mr. Smith; is that right?

19    **THE DEFENDANT:**  Yes, sir.

20    **THE COURT:**  So did you and he go to the carousel to

21    get your checked bags?

22    **THE DEFENDANT:**  Yes.  I seen him down there.  I

23    walked over and helped him.

24    **THE COURT:**  You helped him get the bags?

25    **THE DEFENDANT:**  Yes, sir.

1          THE COURT:  So then how much -- so you went to an

2     automobile?

3          THE DEFENDANT:  Yes.  We went to -- Collier was out

4     there waiting in his car.  My plan was to walk to my car, but

5     they insisted on me getting in the car with them.

6          THE COURT:  So you got in a car driven by Collier;

7     is that right?

8          THE DEFENDANT:  Yes, sir.

9          THE COURT:  Did you have your marijuana with you at

10    that time?

11         THE DEFENDANT:  Yes.  They put it in the trunk.

12         THE COURT:  Did you ever put it in the trunk?

13         THE DEFENDANT:  No.

14         THE COURT:  They put it in the trunk for you?

15         THE DEFENDANT:  Yes.  They put it in the trunk, yes,

16    sir.

17         THE COURT:  Okay.  How many bags?

18         THE DEFENDANT:  Two.  Two suitcases.

19         THE COURT:  Two suitcases --

20         THE DEFENDANT:  Yes, sir.

21         THE COURT:  -- full of marijuana?

22         THE DEFENDANT:  Yes, sir.

23         THE COURT:  Okay.  And then you went in Collier's

24    car.  They picked you up outside in the driveway there where

25    you pick up passengers; is that right?

1     THE DEFENDANT:  Yes, sir.

2     THE COURT:  And what was your plan at that point?

3     THE DEFENDANT:  I was planning to walk to my car.

4   But he insisted on me getting in the car with them.

5     THE COURT:  Were you going to take your marijuana

6   out of his car and walk it over to your car, was that your

7   plan?

8     THE DEFENDANT:  No, sir.  I was just going to meet

9   them in town.  I wasn't going to do it there.

10     THE COURT:  You were going to walk to your car and

11   they were going to take your drugs for you and meet up with

12   them later?

13     THE DEFENDANT:  Yeah.

14     MR. GIBSON:  I have followup, Your Honor.

15     THE COURT:  All right.

16           REDIRECT EXAMINATION BY THE DEFENSE

17   BY MR. GIBSON

18   Q    When you were in California, who bought Tyree Smith's

19   ticket?

20   A    I think Jaondre bought his ticket.

21   Q    Collier?

22   A    Yes.  Uh-huh.

23   Q    Is it your understanding that Jaondre Collier and

24   Tyree Smith had been making runs themselves without you to

25   California to buy drugs for some time?

1    **A**    Yes.  Yes, sir.

2    **Q**    And was it your understanding that Tyree Smith was

3    working for Jaondre Collier at that time?

4    **A**    Yes, sir.

5    **Q**    So when you got out to California and you-all decided

6    to buy this marijuana, they already had a system in place;

7    is that correct?

8    **A**    Yes, sir.

9    **Q**    And isn't it in fact true they agreed as part of it

10   to bring your drugs back with their drugs?

11   **A**    Yes, sir.

12   **Q**    So when you say "for you," it's really for themselves

13   but they're bringing your drugs back as well?

14   **A**    Yes, sir.

15   **Q**    Now, when you went back, when you came back from

16   California to South Carolina, who bought Tyree Smith's

17   ticket back?

18   **A**    Jaondre.

19   **Q**    And prior to him buying that ticket, did he ask you

20   about your flight arrangements?

21   **A**    Yes.

22   **Q**    And in fact, you told him, you said, this is the

23   flight I'm going to be on, this is when it comes in, all

24   those different things?

25   **A**    Yes, sir.

1    **Q**    Did Jaondre tell you at that time that he was going

2    to buy Tyree Smith a plane ticket to be on your exact same

3    flight?

4    **A**    No.

5    **Q**    And in fact, you didn't know that he was going to be

6    on that flight until you saw him in South Carolina; is

7    that not true?

8    **A**    Yes, sir.

9    **Q**    When you got off the plane was it your understanding

10    that when they got back with the drugs that they were

11    going to meet you somewhere else, come by your house or

12    some other and then give you your share of what was in

13    those two suitcases?

14    **A**    Yes, sir.

15    **Q**    It was not your understanding that you were going to

16    get your marijuana at the airport; is that not true?

17    **A**    No, sir.

18    **Q**    And of the marijuana that you bought when you were in

19    California, how many pounds did you buy?

20    **A**    12 pounds.

21    **Q**    And how many pounds did Tyree Smith buy?

22    **A**    Either three or four. Somewhere around there. I

23    think three.

24    **Q**    And isn't it in fact true that Jaondre Collier made

25    actually two purchases while he was in California?

1    **A**    Yes, sir.

2    **Q**    He bought the first time with you, then he went back

3    on his own to someplace else and bought some more drugs?

4    **A**    Yes, sir.

5            **MR. GIBSON:**  Nothing further.

6            **THE COURT:**  We have to take a break here.  I have

7    another matter.  I don't know how long it will take, but it's

8    a telephone conference with some other lawyers.  We'll be in

9    recess.

10           (Whereupon, a recess ensued.)

11           (Whereupon, Court was adjourned for the day.  Case

12   to be rescheduled.)

13           (Court adjourned at 11:25 a.m.)

14

15

16                      CERTIFICATE

17       I,  Michele E. Becker, certify that the foregoing is

18       a correct transcript from the record of proceedings

19       in the above-entitled matter.

20

21   /s/  Michele E. Becker              Date:  December 28, 2023

22

23

24

25